IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**BOBBY L. CARTER,**                                )
                                                    )
                          **Plaintiff,**            )
                                                    )
**vs.**                                             )     Civil No.   12-cv-745-JPG-CJP
                                                    )
**CAROLYN W. COLVIN,**                              )
**Acting Commissioner of Social**                   )
**Security,**                                       )
                                                    )
                          **Defendant.**            )

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge J. Phil Gilbert pursuant to 28 U.S.C. § 636(b)(1)(B).

In accordance with 42 U.S.C. § 405(g), plaintiff Bobby L. Carter seeks judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Mr. Carter applied for benefits in January, 2009, alleging disability beginning on May 7, 2004.   After holding an evidentiary hearing, ALJ Gary L. Vanderhoof denied the application for benefits in a decision dated November 19, 2010.   (Tr. 26-33).   The Appeals Council denied review, and the decision of the ALJ became the final agency decision.   (Tr. 5).   Administrative remedies have been exhausted and a timely complaint was filed in this Court.

1

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.     The ALJ did not properly weigh the opinion of Dr. Thompson.

2.     The ALJ erred in his assessment of plaintiff's credibility.

3.     The ALJ failed to properly consider the limitations caused by plaintiff's mental impairments.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  **42 U.S.C. §423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20**

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For the purposes of this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.
.

C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   **20 C.F.R. §§ 404.1520;** *Simila v. Astrue*, **573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992).**

3

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.   **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984).   See also Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not whether Mr. Carter was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing **Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)**).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant

4

evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Vanderhoof followed the five-step analytical framework described above. He determined that Mr. Carter had not been engaged in substantial gainful activity since the date of the application.   He found that plaintiff had severe impairments of chronic obstructive pulmonary disease (COPD), degenerative disc disease, and history of carcinoma of the larynx.   He further determined that these impairments did not meet or equal a listed impairment.

ALJ Vanderhoof concluded that plaintiff had the residual functional capacity to do a wide range of light work.   Based on the testimony of a vocational expert, he determined that plaintiff was able to do his past work as an assistant manager of a service station, and so was not disabled.

## The Evidentiary Record

5

The Court has reviewed and considered the entire evidentiary record in formulating this Report and Recommendation.   The following summary of the record is directed to the points raised by plaintiff.

### 1.    Agency Forms

Plaintiff was born in July, 1959, and was almost 45 years old on the alleged date of onset.   He was insured for DIB through December 31, 2009.   (Tr. 195).[2]

Plaintiff indicated in a Disability Report that he was unable to work because he had undergone a laryngectomy and he had another spot coming up on this throat that might be a recurrence of cancer.   He also had COPD.   He said he stopped working in May, 2004, because he hurt his arm and his breathing "just got too bad." (Tr. 199).

He was treated by Dr. Bob Thompson for throat cancer, COPD, anxiety, back problems and muscle spasms.   (Tr. 202-203).   He had no insurance and no income, and was unable to get an MRI as recommended by Dr. Thompson.   (Tr. 204).

Mr. Carter worked as an attendant/assistant manager at a gas station from 1997 through 2003.   He then worked until May, 2004, doing maintenance and housekeeping at a nursing home.   (Tr. 200).

Mr. Carter submitted a Function Report in August, 2009, in which he said he lived alone.   On a typical day, he watched TV, went to the mailbox, fixed himself something to eat and sat outside if it was not too hot.   He did no household chores,

---

[2] The date last insured is relevant only to the claim for DIB.

inside or outside, because of his back and breathing problems.   He ate cold cuts or microwaved food for his meals.   He said he could walk one-half of a block and then would have to rest for 30 minutes.   He could only lift 5 pounds, could not squat, bend, kneel or climb stairs.   He did not handle stress well.   (Tr. 264-274).

Plaintiff was approved for a medical card in October, 2009.   (Tr. 282).

### 2.    Evidentiary Hearing

Mr. Carter was represented by an attorney at the evidentiary hearing on October 19, 2010.   (Tr. 41).

Dr. Howard McClure testified as an independent medical expert.   Based upon a review of the records, he testified that plaintiff's condition did not meet or equal a listed impairment.   (Tr. 43).

Dr. McClure testified that plaintiff had a laryngectomy in 1997 for cancer of the larynx.   There was no evidence of recurrence of the cancer.   A nodule on plaintiff's neck was biopsied in November, 2009, and was determined to be a neuroma.   His cancer had not recurred.   An echocardiogram was normal. Pulmonary function testing showed mild COPD.   He opined that plaintiff could do work at the light exertional level.   (Tr. 44).

Plaintiff testified that he lived alone in a house.   His mother lived about 20 feet from his house, on the same property.   He lost his license, so his mother drove him to the grocery store.   The heaviest thing he could lift was a ten pound bag of potatoes.   (Tr. 52-53).   His thirty-year-old son lived in a motor home on the same property.   (Tr. 54).   Mr. Carter testified that he spent his time visiting with his

mother and watching a lot of TV.   (Tr. 58).

Mr. Carter testified that his medications helped, and relieved his pain for 3 to 4 hours.   He used an inhalant for his breathing problems.   (Tr. 61-62).   He had problems with his knees that had gotten worse over the years.   He was able to sit in a recliner for 30 to 60 minutes.   (Tr. 63-64).   He could stand and walk for about 30 minutes.   (Tr. 66).   He got anxiety attacks when he was in crowds.   (Tr. 68).

Plaintiff said he did not do very much around the house.   He cooked in the microwave.   He son helped with anything big.   (Tr. 68-69).

Any exertion caused him to have a "breathing attack."   (Tr. 71).   His knees felt like "a tear, burn" after walking around the grocery store.   He had to put ice on them and sit in the recliner with his legs up.   He could be on his feet for maybe an hour a day.   (Tr. 72-73).   He had tingling in the fingers of his right hand.   (Tr. 74).

Mr. Carter had tried helping his mother around the farm, but he had not been able to do that in over a year.   (Tr. 75).   He felt he could not do his past work at the gas station because he could not be on his feet and did not have the air to do the job.   (Tr. 76).

A vocational expert (VE) testified.   The ALJ asked him to assume a person of plaintiff's age, education and work history who could do light work, with no exposure to extreme heat or caustic chemicals.    The VE testified that this person could do plaintiff's past work as a service station manager, both as he performed it and as it is generally performed.   (Tr. 77-78).

**3.   Medical Treatment**

8

Mr. Carter alleges that he became disabled as of May 7, 2004.

On May 4, 2004, plaintiff's right forearm was x-rayed after he injured it. There was no fracture or dislocation and no bone or joint abnormality.   (Tr. 494). He saw his primary care physician, Dr. Bob Thompson, on May 21, 2004.   Dr. Thompson noted signs of carpal tunnel syndrome on the right, and recommended a nerve conduction study.   (Tr. 372).   On November 17, 2004, a nerve conduction study was consistent with right ulnar neuropathy across the elbow, but showed no evidence of injury in the right forearm and no evidence of carpal tunnel syndrome. (Tr. 396).

In December, 2004, Dr. Thompson noted swelling in plaintiff's right forearm. Plaintiff told the doctor that he wanted to work, but his arm hurt too much.   Dr. Thompson prescribed Soma, Norco and Valium.   (Tr. 375).   Dr. Thompson had been prescribing Valium for plaintiff since at least June, 2003.   (Tr. 368).

In August, 2005, plaintiff told Dr. Thompson that he was having back pain. His father had died, so he was doing a lot of work keeping up rental properties owned by his mother.   Dr. Thompson diagnosed moderate to severe osteoarthritis of both knees and degenerative disc disease of the cervical and lumbosacral spine. (Tr. 376-377).

Dr. Thompson noted in February, 2006, that plaintiff's upper back was hurting after he picked up some firewood.   He was facing 6 months in jail for driving on a revoked license, but hoped to get off with house arrest so he could take care of his mother.   (Tr. 377).

9

In May, 2006, Mr. Carter told Dr. Thompson that his mother was in the hospital.   He was very tired and run down as he had been helping her.   He was building a house and had been putting up sheetrock.   Also, he was taking care of 10 acres.   He was hoping he would not have to do jail time.   He was very anxious, depressed and tired.   (Tr. 378).

Mr. Carter asked Dr. Thompson to increase his Lortab (hydrocodone) in October, 2006.   He had fallen through a roof while he was fixing up apartments to rent.   He was also replacing tile and flooring.   (Tr. 380).

Plaintiff continued to see Dr. Thompson in 2007 and 2008.   In April, 2007, he reported that he was working on a farm.   He had been feeling better and getting some strength back.   He had been looking for a job, but had hurt his left shoulder picking up a heavy object.   (Tr. 381).   In June, 2007, he reported that his left shoulder and back were bothering him, and he had a knot on the outside of his throat.   Dr. Thompson recommended that he have a biopsy to determine whether his cancer had recurred.   (Tr. 383).   In June, 2008, he complained of low back pain.   He had been doing a lot of work around his mother's farm.   Dr. Thompson noted that he was very tender over the lumbosacral spine.   (Tr. 385).   In October, 2008, he was still working on his house, off and on.   He had been unable to get a biopsy because he did not have a medical card or money.   (Tr. 368).

In March, 2009, Mr. Carter told Dr. Thompson that his cervical pain had decreased since the last visit.   He was having shortness of breath and using his inhaler more during the past week.   He had still not been able to see a specialist

about his lymph node.   Dr. Thompson detected decreased breath sounds with wheezing and cough.   He also found muscle spasms in the neck and back.   (Tr. 407-408).

Dr. Adrian Feinerman performed a consultative examination on April 6, 2009.   Plaintiff complained of shortness of breath, neck pain and back pain.   He gave a history of cancer of the larynx and epiglottis, as well as COPD.   Mr. Carter told Dr. Feinerman that he could walk one-half block, stand for 20 minutes, and sit for 30 minutes.   He said he could squat, bend and perform fine and gross manipulations normally.   He reported no psychiatric history.   On exam, he was 6' 3" tall and weighed 192 pounds.   His neck was supple with a 1x1 cm node on the left side.   His heart rhythm was regular with no murmurs, gallops or rubs. Pulmonary exam showed that his lungs were clear to auscultation and percussion with no wheezes, rales or rhonchi.   The AP diameter was increased.   There were no abnormal findings as to his spine.   The range of motion of the cervical and lumbar spine was full.   There were no abnormal findings as to any of his joints. His shoulders, knees, elbows and wrists all had a full range of motion.   Grip strength was strong and equal.   He had no pain in the weight-bearing joints.   He was able to walk normally and to tandem walk, walk on heels and toes, hop, squat, and arise from a chair without difficulty.   Muscle strength was full throughout. Fine and gross manipulations were normal.   On mental status exam, he was oriented to person, place and time.   His memory, concentration and ability to relate were normal.   (Tr. 423-430).

11

Dr. Thompson completed a form on July 30, 2009, in which he assessed plaintiff's condition.   He opined that plaintiff could occasionally lift up to 10 pounds, and sit and stand/walk for a total of only 90 minutes a day.   The rest of the day would be spent resting in bed.   These limitations were based on findings of degenerative disc disease of the cervical and lumbosacral spine with osteoarthritis, and severe COPD and emphysema.   Dr. Thompson also noted that his cancer had metastasized.   He could only occasionally reach, handle and finger and could never operate foot controls.   He could never balance, stoop, kneel, crouch, crawl or climb stairs due to severe arthritis of the knees.   (Tr. 448 -453).

Dr. Thompson submitted a second report in September, 2009, in which he stated that he had not done pulmonary function testing.   He said plaintiff had chronic bronchitis and had constant wheezing and prolonged expiration.   He had used Albuterol and Advair in the past, which helped, but he could no longer afford them.   (Tr. 454-455).

In November, 2009, an ear, nose and throat specialist evaluated the lump on plaintiff's neck.   Endoscopy did not show any evidence of recurrence of cancer. (Tr. 473).   A biopsy indicated that the lump was a neuroma, and not cancer.   (Tr. 488).

A chest x-ray taken in November, 2009, showed moderately expanded lungs with no evidence of pneumonia or edema.   His heart was normal in size and configuration.   The pulmonary vasculature was not congested.   There was no acute cardiopulmonary disease.   (Tr. 489).

On December 23, 2009, Mr. Carter complained to Dr. Thompson of increased back pain.   He said that he had been working on the farm and dealing with the cold. He also indicated that a biopsy of the mass on his neck was benign. (Tr. 498).

Pulmonary function testing in January, 2010, showed moderate obstructive defect.   Lung volumes and diffusion capacity were normal.   (Tr. 474).

On March 9, 2010, plaintiff reported to Dr. Thompson that he had gone fishing and had gone to "see Laura at high rise."   He became dizzy and had no control over his movements.   Dr. Thompson referred him to Dr. Joseph for evaluation.   (Tr. 495-496).

Plaintiff saw Dr. Joseph for a cardiac evaluation on March 22, 2010, due to difficulty breathing and occasional chest pain.   He was still smoking a half of a pack of cigarettes a day.   He was taking Valium, Soma and Lortab.   He used Spiriva (1 inhalation a day), Pro Air (2 puffs, 4 times a day) and Advair (inhalation 2 times a day).   Electrocardiogram and echocardiogram were normal, as was a nuclear stress test.   The impression was noncardiac chest pain, emphysema and COPD, cigarette use disorder, anxiety and chronic back pain.   (Tr. 502-506).

## **Analysis**

Plaintiff's first and third points rely, in part, on the veracity of plaintiff's testimony, Therefore, the Court will address his second point regarding the credibility analysis first.

The credibility findings of the ALJ are to be accorded deference, particularly

13

in view of the ALJ's opportunity to observe the witness.  **Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)**.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." **Schmidt v. Barnhart, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.   "[D]iscrepancies between objective evidence and self-reports may suggest symptom exaggeration."   **Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008).**

It is true that ALJ Vanderhoof expressed his credibility findings in the boilerplate language that was criticized in cases such as **Bjornson v. Astrue, 671 F.3d 640, 644-645 (7th Cir. 2012), and Parker v. Astrue, 597 F.3d 920, 921-922 (7th Cir. 2010).**   He found that plaintiff's statements were not credible "to the extent they are inconsistent with the above residual functional capacity assessment."   (Tr. 31).   This approach "turns the credibility determination

14

process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." **Brindisi v. Barnhart, 315 F.3d 783, 787-788 (7th Cir. 2003).**

The use of the boilerplate language does not necessarily require reversal. The use of the language can be excused where the ALJ goes on to support his conclusion with reasons derived from the evidence.   See, **Shideler v. Astrue, 688 F.3d 306, 310-311 (7th Cir 2012); Richison v. Astrue, 462 Fed. Appx. 622, 625-626 (7th Cir. 2012).**   The ALJ is required to give "specific reasons" for his credibility findings.  **Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009).**   It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence.  **Ibid.**   See also, **Terry v. Astrue, 580 F.3d 471, 478 (7th Cir., 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record.")   If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies.  **Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).**

ALJ Vanderhoof gave specific reasons for his conclusion that plaintiff's allegations were not credible.  He identified a number of statements that were contradicted by the evidence.  For example, Mr. Carter "alleges numerous complaints related to COPD and degenerative disc disease to include problems

walking, standing, and sitting for extended periods and trouble breathing." However, the ALJ pointed out that the medical evidence did not support his claim of limitations so severe as to preclude all work.   (Tr. 31).   He claimed to have injured his right arm when a refrigerator fell on him, and claimed ongoing hand pain and numbness.   However, an EEG showed no evidence of injury to the forearm.   (Tr. 31).   Most tellingly, plaintiff reported a level of activity to Dr. Thompson that was inconsistent with his claim that he was completely disabled as of May, 2004.   In April, 2007, he reported that he was feeling better and was looking for a job. In 2007, 2008, and 2009, Mr. Carter told Dr. Thompson that he was continuing to work on his mother's farm and to work on his own house.   (Tr. 31-32).

Plaintiff argues that the ALJ could not rely on his reported actives because the ALJ ignored his testimony that he had to rest during the day and had not worked on his mother's farm for over a year before the hearing.   See, Doc. 22, p. 13; Doc. 30, p. 5.   This argument misses the mark.   First, it is not supported by the record.   The hearing was in October, 2010.   Dr. Thompson's records reveal that Mr. Carter was continuing to work at his mother's farm through at least late December, 2009, less than a year before the hearing.   More importantly, as the ALJ concluded, Mr. Carter's claim that he has been totally disabled since May, 2004, is flatly contradicted by his demonstrated abilities during that period.   By his own admission to Dr. Thompson, he was working on his mother's farm, keeping up rental properties owned by his mother, building a house, putting up sheetrock, taking care of 10 acres, working on a roof while fixing up apartments to rent, and

16

replacing tile and flooring.

"Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." **Johnson v. Barnhart, 449 F.3d 804, 805 (7th Cir. 2006)**.   Here, the ALJ was justified in concluding that the evidence contracted Mr. Carter's claim that he was so severely limited as to be unable to work at all.   See, **Pepper v. Colvin, 712 F3d. 351, 368-369 (7th Cir. 2013)**, affirming the ALJ's credibility determination where the record contradicted plaintiff's claim that she was unable to do activities required by her former employment.

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." **Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009).**   ALJ Vanderhoof's analysis is far from patently wrong.   It is evident that he considered the appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's credibility. **Castile v. Astrue, 617 F.3d 923, 929 (7th Cir. 2010).**

In plaintiff's first point, he argues that the ALJ did not properly consider the opinion of Dr. Thompson, set forth in his report of July 30, 2009.

The version of 20 C.F.R. §404.1527(d)(2) in effect at the time of the ALJ's decision provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able

17

to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [Emphasis added]

It must be noted that, "[W]hile the treating physician's opinion is important, it is not the final word on a claimant's disability."  ***Books v. Chater*, 91 F.3d 972, 979 (7ᵗʰ Cir. 1996)(internal citation omitted).**   If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions.  See, 20 C.F.R. §404.1527(d).[3]  In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record."  ***Schaaf v. Astrue,* 602 F.3d 869, 875 (7ᵗʰ Cir. 2010), citing §404.1527(d).**

Thus, the ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of a consulting physician, internally inconsistent, or inconsistent with other evidence in the record.  ***Henke v. Astrue,***

_____

[3] The Court cites to the version of 20 C.F.R. §§ 404.1527 that was in effect at the time of the ALJ's decision. The agency subsequently amended the regulation by removing paragraph (c) and redesignating paragraphs (d) through (f) as paragraphs (c) through (e). 77 Fed. Reg. at 10656–57 (2012).

**498 Fed.Appx. 636, 639 (7ᵗʰ Cir. 2012);** *Schmidt v. Astrue*, **496 F.3d 833, 842 (7ᵗʰ Cir. 2007).**   If the ALJ determines that a treating doctor's opinion is not entitled to controlling weight, he must apply the §404.1527(d) factors to determine what weight to give it.   *Campbell v. Astrue*, **627 F.3d 299, 308 (7ᵗʰ Cir. 2010).** Further, in light of the deferential standard of judicial review, the ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax."   *Berger v. Astrue*, **516 F.3d 539, 545 (7ᵗʰ Cir. 2008);** *Elder v. Astrue*, **529 F.3d 408, 415 (7ᵗʰ Cir. 2008).**

Dr. Thompson opined that Mr. Carter had severe limitations.   For instance, he was able to sit, stand and walk for only a total of 90 minutes per day, and could never climb stairs, ramps or ladders, balance, stoop, kneel, crouch or crawl.   (Tr. 448-453).   The ALJ declined to give this opinion controlling weight because there was a lack of objective findings and it was "not supported by the functioning levels" noted in the doctor's own records.   (Tr. 32).

Here, ALJ Vanderhoof easily met and exceeded the "minimal articulation" standard.   Dr. Thompson's opinion was not supported by objective findings.   Dr. Thompson diagnosed degenerative disc disease and osteoarthritis, but his records contained no objective studies such as x-rays or MRI studies to support such findings.   He diagnosed "severe COPD," but had never ordered or reviewed a pulmonary function study.   Further, his opinion was based in part on his

diagnosis that plaintiff's cancer had metastasized, which was incorrect.   The ALJ was also correct that Dr. Thompson's records reflected that Mr. Carter was functioning at a level far greater than the limitations indicated in the doctor's report.

Plaintiff argues that the ALJ erred in not explicitly discussing the factors set forth in §404.1527.   However, the ALJ is not required to explicitly discuss each factor where he discounts the treating doctor's opinion as unsupported by his own records and inconsistent with other evidence in the record.   **See, *Henke v. Astrue*, 498 Fed. Appx. 636, 639-640 (7th Cir. 2012)**.   Further, plaintiff has not demonstrated how application of the §404.1527(d)(2) factors would mandate giving more weight to Dr. Thompson's opinion.   Dr. Thompson is not a specialist, his opinion was not supported by medical signs or laboratory findings, and it was inconsistent with other evidence in the record, notably his own records, plaintiff's activities and the results of Dr. Feinerman's exam.   With little or no objective findings, Dr. Thompson's opinion was based, in large part, on plaintiff's subjective complaints.   An ALJ may discount a medical opinion that is based solely on the plaintiff's subjective complaints.   ***Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).**

Lastly, plaintiff argues that the ALJ erred in not properly considering limitations caused by his anxiety.   This argument is a nonstarter.   There were scattered references to anxiety in Dr. Thompson's records, and Dr. Thompson had

been prescribing Valium since at least June, 2003, when plaintiff was still working. (Tr. 368).   Plaintiff presented no evidence that his anxiety worsened such that it interfered with his ability to work.   It was plaintiff's burden to present evidence of the existence and severity of his impairments.   20 C.F.R. § 404.1512(c).

The only reference to any limitation arising from anxiety at the hearing was that Mr. Carter got "anxiety attacks" when he was in a grocery store and it was "very, very crowded."   In response to a question from his attorney, he testified, "I get kind of flustered a little bit because I can't just go ahead and do what I have to do and get out.   I have to, you know, stand and let people go by me and, you know, that's just extra time I'm on my feet.   You know, that cuts my time for shopping down because then I get, you know, sore and down."   (Tr. 68).

Where, as here, the applicant is represented by counsel, the ALJ is entitled to assume that he is presenting his strongest case for benefits.   ***Buckhanon ex. rel J. H. v. Astrue*, 368 Fed. Appx. 674, 679 (7th Cir. 2010); *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987).**   Mr. Carter did not present evidence at the administrative level that his anxiety, for which he took medication while able to work full-time, interfered with his ability to work. The ALJ cannot be faulted for failing to consider limitations that were not established by the record.

## Recommendation

This Court is convinced that ALJ Vanderhoof made no errors of law and that

his decision is supported by substantial evidence in the record as a whole. Therefore, this Court recommends that the Commissioner's final decision be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before March 3, 2014.

**Submitted:   February 13, 2014.**


**<u>s/ Clifford J. Proud</u>**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**